**METROPOLITAN BODY CO. v. DIVCO CORP.**

**DIVCO CORP. v. METROPOLITAN BODY CO. et al.**

**Civ. A. No. 5290.**

United States District Court

E. D. Michigan, S. D.

Dec. 29, 1950.

Daniel G. Cullen, Detroit, Mich., (Charles L. Byron, and Paul O. Pippel, Chicago, Ill., of counsel), for plaintiff and counter-defendants.

William A. Strauch and J. Matthews Neale and Strauch & Hoffman, all of Washington, D. C. (James D. Tracy and Dykema, Jones & Wheat, all of Detroit, Mich., of counsel), for defendant and counter-claimant.

KOSCINSKI, District Judge.

Plaintiff brought this suit under the Federal Declaratory Judgment Act, 28 U. S.C.A. §§ 2201, 2202, to secure adjudication of invalidity, for lack of invention, and also for adjudication of non-infringement, of seven patent claims under three patents owned by the defendant Divco Corporation, namely, 1,777,966, issued October 7, 1930 to Fageol, on application filed August 16, 1927, renewed February 21, 1930, relating to delivery trucks; 1,957,645, issued May 8, 1934 to Herman, on his application filed May 30, 1930, renewed July 27, 1932, relating to delivery vehicles; and 2,333,323 issued February 25, 1941, to Nicol, on his application filed April 16, 1938, relating to vehicles.

All three patents relate generally to improvements in the manufacture of light delivery trucks, such as are adaptable and used for house-to-house deliveries, necessitating frequent stops, and frequent leaving and entering the vehicle by a driver in the course of covering his route.

Issue was joined on Claim 7 of Fageol Patent, Claims 1, 2 and 3 of Herman Patent, and Claims 4, 9 and 13 of Nicol Patent, and these seven claims of the three patents are the basis of this controversy.

Divco Corporation asserts the validity of all seven claims of the three patents, and, by counterclaim against Metropolitan Body Company and its customer, International Harvester Company, charges them jointly and severally with direct and contributory infringement of all seven claims. Divco Corporation further charges them with conspiracy to destroy the value of its patent rights, and seeks triple damages and injunction.

The parties will hereinafter be referred to as Metro, Divco, and Harvester.

During the pendency of these proceedings, Harvester acquired complete control of Metro, and operates it as a wholly owned subsidiary.

In its complaint for declaratory judgment, Metro relies on prior art and Filing Wrapper references, and further charges that the claims in suit represent unwarranted departures from the subject matters represented as the inventions of the patentees thereof at the time of filing the applications.

Both Metro and Divco manufacture and sell light delivery truck bodies. The Metro-manufactured bodies are placed on chassis furnished by Harvester, and the delivery trucks so completed are sold by Harvester.

Divco concedes each of the seven claims of the three patents to be a combination of old elements, well known in the prior art, claiming, however, achievement of a great advance in the art in attaining a new and useful result amounting to invention.

Metro and Harvester deny invention in any of the seven claims over the prior art. It is their contention that the admittedly old elements of each of the seven claims perform the same old functions with the same old results in the same old ways, leaving nothing for the engineers and designers to do but choose the old elements they wished to use and, further, that the use of old and known elements in each of

the seven claims is but an aggregation of these elements, and, therefore, no invention.

On the issue of infringement, Metro and Harvester contend that the Metro body is an embodiment of and follows the highly developed prior art, using only old features and old elements with old and well-known results, and, therefore does not infringe the claims in suit. Metro further contends that in building the accused bodies it but follows its own prior practice.

For validity of all seven claims, Divco relies primarily on the history of the art in the light delivery truck manufacturing industry, on a claimed long felt want of a vehicle which is the embodiment of ·the claims in suit, on commercial success, imitation by competitors, as well as being the first to combine the various elements constituting the seven combination claims. ·

Metro filed over 200 patents as exhibits in this case in support of its attack on the validity of Divco's patent claims. A review of these patents is of historical interest in the evolution and development of delivery vehicles during the past seventy-five years. The Patent Office File Wrappers disclose that many of these patents were considered by the Examiners in the patent proceedings . involving the seven claims here.

The manufacture and use of motor vehicles for deliveries of merchandise, goods, and products such as milk, bakery goods, and other commodities, and the use of such vehicles by launderies, department stores, and generally, for parcel deliveries, has been in progress for a long time, antedating by many years all seven claims of the three patents involved herein.

Findings of Fact
Fageol Patent No. 1,777,966
Claim 7

1. Claim 7 of the Fageol Patent[1] discloses a motor truck having a body frame which serves as body members. The body, including its frame, is supported on axles by means of springs and on the ends of the axles are the usual wheels. Whereas the forward and rear portions of the body floor and frame are above the axles, the central portion of the floor and frame of the body is dropped to the level of the axles. The truck has its motor forward, and the latter is connected to the rear axle by a drive shaft which in one form is below and in another form is above the lowered or dropped central floor, being covered by a tunnel-like member. The body is wide enough and long enough to extend over all four wheels and the motor. The body sides have doors at the lowered or dropped central portion and the latter extends across the body, from door to door.

2. Claim 7 in suit specifies that the floor within the body opposite the door and adjacent to and to the rear of the motor has a floor line at both sides of the body as low as the axles. This is true of the Fageol body which has a dropped or lowered central floor, located at the doors and extending completely across the body, connecting the opposite side doors.

3. The specifications further describe the low floor as being about nine inches above the ground and with a special step to enable the driver to enter or leave the vehicle with facility and without unnecessary loss of time.

4. The low floor achieved by Fageol resulted from the elimination of the two heavy, high level, longitudinal frame members of the conventional or standard chassis, and the substitution for it of "a chassis including a frame." By mounting the engine, springs and axles directly on the base or floor frame of the body, Fageol was able to lower the floor of the body, thus making the chassis integral with the body. The Twin-Coach milk truck designed and manufactured by Fageol previously to the pat-

[1]. 7. A motor driven delivery vehicle comprising a box like body, a chassis including a frame, a forwardly disposed motor, axles, wheels, springs, and a drive shaft extending from said motor to one of said axles, said chassis including the wheels thereof being completely housed by said box-like body, a door opening in the side of said body and a floor within the body opposite said door and adjacent to and to the rear of said motor end and having a floor line at both sides. of said body that is as low as a plane containing the axes of the axles.

ents here involved, disclosed a truck whose bus-like body had a base or floor frame sufficiently reinforced by the sides, ends and roof or top, to be sturdy enough to support the motor and the springs, and the axle, and in this way dispensed with the conventional separate high level, longitudinal chassis frame members. Thus Claim 7 of Fageol follows the construction of the Twin-Coach milk truck.

5. It is evident, therefore, that the term "chassis" as used in Claim 7 of the Fageol Patent does not mean the high level, longitudinal chassis frame members, but rather a construction wherein the base frame of the body serves as the chassis, in lieu of the standard chassis having the two longitudinal members. During the trial and in the briefs filed by counsel such structure was characterized by counsel as a "chassisless" vehicle.

6. Thus the term "chassis" may mean either a construction based upon the two high level longitudinal members, such as characterizes much of the prior art of the Metro construction, or, it may consist of the rectangular base frame of the body with the general running gear, without the two high level longitudinal members, such as described in Claim 7 of the Fageol Patent, where the base frame of the body serves as the chassis and as a mounting for the axles and motor. This departure by Fageol, the elimination from the chassis of the two high level longitudinal members, enabled him to achieve the low through floor extending across the body, "as low as a plane containing the axes of the axles," although with a "tunnel" to house the drive shaft that connects the forwardly disposed internal combustion engine to the rear axle.

7. The File Wrapper discloses that Fageol, in order to obtain the allowance of Claim 7, represented that he had eliminated the conventional chassis which included the two high level longitudinal members, in order to attain the low floor level. "This low arrangement of the floor is made possible by the absence of the chassis frame members extending completely from end to end of the vehicle, heretofore generally used." (File Wrapper, p. 53). "The ve-hicle is free of longitudinal members extending from end to end of the body." (File Wrapper, p. 57). Fageol also represented to the Patent Office that in the previous construction of such vehicle, a high floor was regarded as necessary because of the usual continuous longitudinal chassis frame members, and because it was thought that the drive shaft would interfere with the arrangement of the floor such as described in the claims. (File Wrapper, p. 57).

8. As between the two types of chassis, Fageol, in Claim 7, chose the one which would enable him to achieve his objective of a low through floor, as against the high level floor necessitated by the use of a chassis with the two longitudinal members. The language of the specifications, page 2, beginning with line 14, "mounted or built on said frame in any suitable manner," cannot be interpreted to mean both types of chassis, since such present interpretation would be contrary to Fageol's arguments and representations made in the Patent Office prior to the granting of this claim.

9. Although both Metro and Divco have reached the same result, they have not reached it by the same means. To achieve its result, Divco eliminated the longitudinal high level chassis and dropped its frame, while Metro, following the earlier teachings of the art, retains its high frame, producing a high level floor, with steps outside the chassis frame.

10. The early Divco Detroit Model B truck shown on page 27 of Motor Vehicle Monthly of June 25, 1925, represents a prior art truck known and in use before Fageol. It employed a high level frame, i. e. a frame above the axles, which included longitudinal members extending completely from end to end of the vehicle frame and preventing the provision of a low floor within the body. In this early Divco truck the steps were partially built in. Metro extends the width of its body to enclose the steps entirely.

11. On p. 56 of the File Wrapper, Fageol distinguished Claim 7 embodying the low floor, from the early Detroit vehi-

cle with a high level floor. In a crowded art such as the manufacture of light delivery motor vehicles, over a long period of time, claims of a secondary patent must be construed narrowly and are of necessity limited to the language appearing in the claim, as interpreted in the light of the proceedings in the Patent Office, lest the patentee encroach on the public domain.

12. The Metro vehicle does not have a low floor extending across the vehicle because the high level chassis frame members which extend from end to end of the body would interfere with the provision of a low level floor extending across the body. Metro and Claim 7 of Fageol represent separate and distinct types of low entrance for light delivery trucks.

13. This high level floor of the Metro body is cut into at the door, to provide built-in low steps, or step wells, which are outside of the high level, end-to-end frame members, even though they are within the body, like the early Detroit streetcars, the old, prior art built-in step or step-well cannot be regarded as the same means as the low level through floor extending across the body provided by Fageol.

14. High level floors of motor vehicles with built-in steps or step-wells such as the Divco Model B truck (1925), the Field Bus (1914), the early (1923) Detroit streetcars, antedate the low floor of Claim 7 of the Fageol Patent. The accused devices here follow the construction of such prior art.

15. The Fageol claim in suit, then, describes any type of a motor driven vehicle, having a body which serves to support the axles and running gear, and thus dispenses with the usual separate chassis frame comprising separate longitudinal members, with the body thus being enabled to have a low level through floor extending across the body and not interfered with by the longitudinal frame members of a chassis frame separate from the body.

16. To refute the assertion that Fageol had made a patentable invention in producing the structure defined by Claim 7, Metro refers to the state of the art at the time of Fageol and has introduced in evidence certain publications and patents showing several different prior art vehicles. These are respectively the vehicle known as the Pak-Age-Car, disclosed at p. 168 of Autobody of May, 1927, PX-4 and p. 32 of The Motor Truck of March, 1926; the vehicle known as the Field Bus, disclosed in the publication Commercial Vehicle, p. 38 of July 15, 1914, PX-23; the vehicle of the Cummings Patent 1,544,816, PX-16; the vehicle of the Doble Patent 1,384,898, PX-15; and the previously mentioned vehicle known as the early Detroit Divco vehicle.

17. The Pak-Age-Car is also shown in a Stutz 1938 catalog in evidence as PX-97. By letter of December 1, 1937 (Record p. 1143-1145) Divco, through its present counsel, asserted the Pak-Age-Car to "constitute a direct infringement" of said Fageol patent. This Pak-Age-Car, accused as an infringement on December 1, 1937, is the same as the Pak-Age-Car shown in the prior art publications, and so anticipates Claim 7 in suit, by application of the rule that that which infringes, if later than the patent in suit, anticipates when found to be earlier.

18. The structure defined in Claim 7 differs from the Pak-Age-Car disclosed in the various prior advertisements and publications of the Pak-Age-Car (PX 4 and 5) only in the location of the motor, forwardly instead of at the rear of the body, as in the Pak-Age-Car. Every element of Claim 7 is found in the Pak-Age-Car. Forwardly located motors were known and were conventional. No new function has been asserted or found for the motor in its relocated position, forward instead of rear. The motor operates in the same way and for the same purpose whether located in the rear, as in the Pak-Age-Car, or in the front, as mentioned in Fageol's Claim 7, and as shown in the following prior art patents and publications: Patents to Levy, 1,038,-162; DeKalb truck of The Commercial Vehicle of July 15, 1914; Butler patent 1,719,-587; Wales patents 1,475,331 and 1,475,229; and as known to be conventional and old at the time of Fageol. The relocation of the motor does not create a new combination but rather the combination of Claim 7 is the same as the combination of the Pak-

Age-Car, so that there is neither new function nor new result under Claim 7, and therefor no patentable invention.

19. This is also substantially true of the relation of Claim 7 to the Field Bus characterized by the provision of a low floor immediately forward of the rear axle and a rearwardly located electric motor.

20. All the advantages and improvements attributed to the Fageol Claim 7 vehicle are found in "The Motor Truck" publication of March 1926, at page 32, as embodiments of the Pak-Age-Car, including economy of operation, adaptability for house-to-house deliveries, convenience of the driver to stand up to his full height, low floor 14 inches from the ground, enabling the driver to step off or on the truck with ease, the saving of two hours a day for the driver, and a vehicle designed to supplant the horse-drawn vehicle on routes where frequent stops are necessary.

21. The only difference between Claim 7 of Fageol and the Pak-Age-Car description is the extension of the floor within the body opposite the door "to the rear of said motor." The extension of a floor, like the extension of the counter in The Great Atlantic & Pacific Co. v. Supermarket Corporation, Supreme Court, December 4, 1950, does not amount to an invention. Equally,

there cannot be invention in extending the length or width of a delivery vehicle body, or the moving of a motor in such truck, where each of them perform the same function with the same result.

22. Here, the problem confronting Fageol, if any, was already solved by the Pak-Age-Car. Such changes for convenience as are described in Fageol Claim 7, and differing from the Pak-Age-Car, do not amount to invention, nor do obvious improvements and expedients that are suggested to the engineer, designer or any one skilled in the art of designing or building delivery vehicles, and based upon their collective experience or knowledge in the prior art.

23. There is here no co-action or co-operation by the various elements of Claim 7. There is here an aggregation of old elements, each of which continues to perform its work and serve the uses as they had always done in the past, alone, or together with various other elements usually found in the prior art relating to motor delivery vehicles. Such aggregation is not invention.

### Herman Patent #1,957,645
### Claims 1, 2 and 3

24. The Herman Patent discloses, and Claims 1, 2 and 3[2] thereof in suit define a

2. 1. A delivery body adapted for use upon a motor driven vehicle chassis having front and rear wheels, said body having a storage compartment of a width substantially equal to the tread of said wheels and having a door opening in one side wall thereof, a low level platform within the boundary of the body adjacent to the side door opening aforesaid and located intermediate the front and rear vehicle wheels, front and rear partitions connecting the low level platform with the floor of the storage compartment, said front and rear partitions extending substantially transverse of the body and respectively located substantially in alignment with the front and rear vertical edges of said side door opening, a door structure slidably supported interiorly of the vehicle side wall and operable when in its forwardmost position to cooperate with the front partition for closing the side door opening, said door operable when moved rearwardly from the closed position to

assume a position rearwardly of said rear partition behind the vehicle side wall of the storage compartment so as to be substantially concealed from view, and door guiding means extending behind the vehicle side wall and thereby concealed from view, said means supported substantially at the level of said low level platform and extending rearwardly of said rear partition whereby to cooperate with the lower edge of said door when open for maintaining said door structure free from a rubbing contact with the vehicle side wall.

2. A delivery body adapted for use upon a motor driven vehicle chassis having front and rear wheels, said body having a storage compartment of a width substantially equal to the tread of said wheels and having a door opening in one side wall thereof, a low level platform within the boundary of the body adjacent to the side door opening aforesaid and located intermediate the front and rear vehicle wheels, front and rear par-

motor truck having a high level floor with built-in platforms in the form of steps or step wells. At the step wells are door openings and inside sliding doors having door guiding means at their lower edges. These lower edges and the door guiding means are at the steps, well below the high level floor at whose level terminate and may be found the lower edges of the side walls of the body. The side walls of the body do not extend down to the steps nor to the lower edges of the doors nor to the door guiding means, so that the door guiding means are exposed and are not concealed behind the side panel, contrary to the language of all three claims.

25. In the specifications it is stated, among other things, that "* * * the invention resides in the arrangement of the doors upon the body and the manner in which they cooperate with the body to completely close the door openings." Here,

again, Divco repeatedly conceded all claims herein suit to be old, relying only on a new and useful result.

26. Substantially the entire combination of any one of these three patent claims may be found in the prior art patent to Butler, 1,800,777. Butler filed application for his patent January 27, 1930, and the Patent issued April 14, 1931. Herman's application was filed May 30, 1930, renewed July 27, 1932, and Patent issued May 8, 1934.

27. The Herman Patent claims in suit relate to the provision of doors for the doorways in low entrance vehicles. Sliding doors in low entrance bodies are old in motorized delivery vehicles. The combination of sliding doors with low entrance bodies first appeared in the milk wagons of the Hoover Wagon Company in 1910, and in motorized delivery vehicles by Maurer 1,831,360, Butler 1,800,777, and Butler 1,719,587.

titions connecting the low level platform with the floor of the storage compartment, said front and rear partitions extending substantially transverse of the body and respectively located substantially in alignment with the front and rear vertical edges of said side door opening, a door structure slidably supported and guided interiorly of the vehicle side wall and operable when in its forwardmost position to cooperate with the front partition for closing the side door opening, said door operable when moved rearwardly from the closed position to assume a position substantially rearwardly of said rear partition behind the vehicle side wall of the storage compartment so as to be substantially concealed from view, the outer edge of said rear partition spaced from the inner face of the vehicle side wall to provide an opening accommodating the door structure when open, and door guiding means extending rearwardly of the rear partition, said guiding means being concealed behind the vehicle side wall and arranged to maintain said door structure free from rubbing contact with vehicle side wall while being opened.

3. A delivery body adapted for use upon a motor driven vehicle chassis having front and rear wheels, said body having a storage compartment of a width substantially equal to the tread of said wheels and having a door opening in one side wall thereof, a low level platform within the boundary of the body adja-

cent to the side door opening aforesaid and located intermediate the front and rear vehicle wheels, front and rear partitions connecting the low level platform with the floor of the storage compartment, said front and rear partitions extending substantially transverse of the body and respectively located substantially in alignment with the front and rear vertical edges of said side door opening, a door structure slidably supported interiorly of the vehicle side wall and operable when in its forwardmost position to cooperate with the front partition for closing the side door opening, said door operable when moved rearwardly from the closed position to assume a position rearwardly of said rear partition behind the vehicle side wall of the storage compartment so as to be substantially concealed from view, the outer edge of said rear partition spaced from the inner face of the vehicle side wall to provide an opening accommodating the door structure when open, and door guiding means supported substantially at the level of said low level platform and extending through said opening, said door guiding means supported on said platform and extending rearwardly of the rear partition, said door guiding means being further concealed behind the vehicle side wall and constructed for guiding the door structure free from a rubbing contact with the said vehicle side wall when being opened.

28. The combination of inside sliding doors with step well entrances appears in the old Detroit Street Railway cars and in Farmer 432,265.

29. Various forms of doors were old and well known and available for choice and use to the body builders or designing engineers. Swinging doors, folding doors, and sliding doors were known; and the sliding doors that were old were used either inside or outside the body. Merely changing the location of the old sliding door of the old combination from outside to inside the body is but an obvious expedient. The inside sliding door provides no new function and no new result whether it be used in the step well of a truck or the step well of a streetcar. The claimed "more efficient" operation of the door does not amount to patentable invention, although it be more convenient or more serviceable.

30. The use of an inside sliding door with a bottom door guiding means is stressed in the claim. The high level floor, built-in-step style body was not new with Herman, nor was Herman the first to provide a sliding door in such a body, in view of the old patent to Butler 1,800,777. The selection of a well-known type of door construction, such as the inside sliding door, or moving such door from the outside of the body to the inside of the body, so that it may be concealed from view when slid rearwardly, without changing the function, is not the exercise of invention, even though the door or door guiding means behind the vehicle side wall be "concealed," or "substantially concealed," by the side wall.

31. All three claims have in common the element of concealing of the door guiding means. This element was injected into the claims by amendment long after the application was filed and was described as an "essential feature." The failure on the part of Herman to disclose in drawings or specifications this so-called essential feature of Claims 1, 2 and 3 deprives these claims of the foundation required by R.S. 4888, 35 U.S.C.A. § 33, as a basis for valid claims.

32. The combinations of each of these claims do not define a patentable invention. Each of said claims has been anticipated.

### Nicol Patent 2,333,323
### Claims 4 and 13

33. Nicol Claim 4[3] defines a side wall unit for a vehicle body made up of a skeleton frame of members welded to one another and covered by a side panel of sheet steel, also welded to the frame. It is directed to the construction of a particular type of prefabricated side wall unit in which the frame members are welded together and are arranged to form "a unitary skeleton frame for resisting and distributing stresses incident to operation of the vehicle," and sheet metal external body panel means integrally united with the frame.

34. Claim 13[4] is more limited in that it requires a unitary skeleton frame made up of horizontal and vertical structural metal elements certain of which are required to serve as a rear side door post, a rear body corner post and a horizontal panel brace whose opposite ends are welded to said posts, and sheet metal body panel means integrally united to said skeleton frame between said posts and resilient strip material between said brace and the interior of said panel means.

35. The evidence in this suit shows an appreciation of the advantages of prefabricated body sections or units in the de-

---

3. 4. A vehicle body, a side unit comprising a plurality of relatively light metal structural elements lying in substantially a single plane and welded together to form a unitary skeleton frame for resisting and distributing stresses incident to operation of the vehicle, and sheet metal external body panel means integrally united with said frame.

4. 13. A side wall unit for a vehicle body comprising a unitary skeleton frame made up of a plurality of integrally united generally horizontal and vertical structural metal elements, certain of said elements comprising respectively a rear side door post, a rear body corner post and a horizontal panel brace whose opposite ends are welded to said posts, external sheet metal body panel means integrally united to said skeleton frame between said posts and resilient strip material between said brace and the interior of said panel means.

livery vehicle art as early as 1902 when the sectional body structure of North Patent 717,903 was evolved and that the cost and disadvantages of the prefabricated structures as known in the art resulted in their non-use.

36. The evidence also shows recognition by vehicle body manufacturers of the desirability of rubber, fabric or like strips as a rattle or squeak preventative in vehicle body joints as early as 1891 as shown by Vollrath 520,126, also a sound deadener for coating the inner face of metal siding sheets to prevent metal to metal contact between such sheets and the framing ribs to which they are secured as early as 1908, as shown by Bauer 931,719 and, as early as 1928 a facing for framework strainers to avoid metal to metal contact between the strainer and metal siding freely movable with respect to the strainer, as shown by Groehn 1,827,743.

37. Divco's expert witness, Chapman, testified that Nicol's problem was the building of a body side unit which would have all the advantages of knock down construction, such as easy assembly, easy disassembly in case of severe damage, but which would also have all the advantages of a unitary steel structure when it was assembled into a body; at the same time he wanted a smooth wall for the paneling, an attractive appearance, and low cost. This witness further stated that the knock down body is heavy and expensive to build, and that when it is bolted together it is flexible and not too strong for regular truck service, whereas a unitary steel structure is very strong, light, and relatively inexpensive to manufacture, but that it is difficult to replace major units in case of any collision damage, and that a longer time is needed in building it up on a production line.

38. Chapman testified in minute detail to the similarity of the Metro body with Claims 4 and 13 of the Nicol Patent. However, the combinations defined in Claims 4 and 13 were well known to the art, as evidenced by patents to Theriault 2,175,571, Croce 1,233,319 and Davis 2,029,756. Nicol Claim 4 does not define a new device and no patentable invention in view of these prior art patents.

39. In an attempt to distinguish the structure of Claim 4 from these prior art patents, Chapman presents a theory that the panel of Nicol welded to the frame takes no stress, but that all the stress is absorbed by the frame. However, there is nothing in these claims which defines the panel as being stress-free, as the case must be decided upon the language of the claims, and therefore such testimony is immaterial and is contrary to what Nicol himself had asserted in his patent on p. 4 lines 1-18 where the panels are listed among the elements which are described as forming a truss in which the individual structural elements aid each other in resisting stresses.

40. Likewise to support his case on Claim 4, Divco asserts that the sectional or prefabrication construction advanced by Nicol is new in that it enables easy repair by replacement of a side unit in event of collision damage. This, however, is inherent to all prefabrication or sectional construction which Divco admits was old practice. Prefabrication and sectional construction was well known, as in the early patent to Maurer 1,831,360, and Dayes Patent 1,980,787. The fact is also established in the Metro deposition wherein it appears that Metro from its early days in building bodies and cabs, employed the well known prefabrication and sectional construction for side units and other units of its bodies and cabs.

41. Nicol Claim 13 differs from Claim 4 by including in the combination of Claim 4 a strip of resilient material for antisqueak or anti-rattle purposes between the sheet metal panel and the frame. The provision of such a strip is an old expedient in the art. It was disclosed in numerous prior art patents and publications for the same purpose, such as Groehn 1,827,743. Its addition to the combination of Claim 4 provides no new function and no new result, and the inclusion of it in the combination defined by Claim 13 does not amount to patentable invention.

### Nicol Patent 2,233,323
### Claim 9

42. Nicol Claim 9[5] is directed to the provision of a rim on the rear edge of a shelf or loading area forward of the low level floor extending across the body that characterizes the Divco truck embodying the Nicol Patent. It was admitted by Nicol that everything in the claim was found in the early Fageol Patent except the rim, but even the rim was present in the prior art Twin-Coach as disclosed in its catalogue, a prior art publication in evidence here as PX-2. That publication shows the Twin-Coach truck as having a rim on the rear edge of the shelf. The rim in the Twin-Coach truck is found to be identical with the rim of Nicol's Patent disclosure and Claim 9, and is found to operate equally as claimed for Nicol's rim i. e., to prevent liquid on the front shelf from spilling down onto the low level floor upon which the driver stands.

43. Hence, Claim 9 defines nothing new in view of the prior art Twin-Coach truck and the publication disclosing it, and defines no patentable invention.

44. In addition, the provision of a rim on a shelf to prevent water on that shelf from draining to the floor is an old and well known expedient as shown in numerous prior art examples in evidence, such as Schroeder 1,346,470, Field 1,680,531, Daniels Des. 107,407, Fageol 2,003,431. Its inclusion by Nicol in a combination otherwise admitted by Nicol to be a combination of old elements does not define a new combination since there was no new functioning for the rim not present for rims in the prior art uses of rims. The incorporation of a rim for the purposes specified is not patentable invention, and the claim is found to define no patentable invention.

45. Claim 9 of Nicol, like Fageol Claim 7 in suit, specifies the floor to be of low level. The Nicol patent truck is characterized by the low level through floor extending across the body. In the Metro truck, on the other hand, there is no low level through floor extending across the body; rather the floor is of high level. The built-in steps are not a floor extending across the body. The art is crowded and the Court finds the claim limited by such art to the precise Nicol structure.

### Discussion of Law

Divco rests its case largely on presumption of validity of its patents herein suit, the heavy responsibility resting upon one who challenges the validity of a patent, the history and background of its patents, the solving of a problem facing the trade. It cites the desirable results of each combination, such as decreased cost of operation from that of a horse-drawn vehicle, more pay load space and ability of the driver to do more work per day, as examples of some of the advantages. It also relies for validity of its patent claims on a long felt want, commercial success, acceptance of licenses, imitation by competitors, and the attainment of a new unitary result in each case. Divco also relies strongly on the cases cited by it which hold that a new combination of old elements which produce a new and useful result, amounts to invention. Divco cites a long list of cases to the effect that history and not hindsight should govern in the determination of patentability. Thoughtful consideration was accorded such indicia of invention.

However, the fact that all the elements of the seven combination claims in suit were old and well known in the art and freely available to skilled artisans, considered in the light of The Great Atlantic & Pacific Tea Company v. Supermarket Corp., supra, and the severe tests laid down in that case for determining validity of secondary patents, such as the claims in suit, must here receive first consideration.

---

5. 9. A delivery vehicle body having a side doorway, an elevated cargo platform within said body forwardly of said doorway, a low floor opening to said doorway, said floor being spaced from the vehicle roof to provide standing height clearance within the body, and an upstanding rim extending along the rear edge of said platform, said rim preventing waste liquids from said cargo space from draining to said floor.

The art of vehicle builders is old. Metro has been building such vehicle bodies since 1909. The fact that upward of 200 patents, most of them relating to motor driven delivery trucks, have been placed in evidence here, is eloquent proof that the art of manufacturing motor delivery trucks is in a crowded field. All these expired prior art patents are in the public domain. It is from that source the seven claims in suit were borrowed.

In the recent case of The Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 71 S.Ct. 127, Justice Jackson speaking for the court observed that the concept of invention is inherently elusive when applied to combination of old elements. To quoth from the opinion in that case, 71 S.Ct. 130: "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. * * * Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

In an early case, Reckendorfer v. Faber, 92 U.S. 347, 356, 23 L.Ed. 719, the Supreme Court said "An instrument of manufacture which is the result of mechanical skill is not patentable. Mechanical skill is one thing; invention is a different thing. Perfection of workmanship, however much it may increase the convenience, extend the use, or diminish the expense, is not patentable."

A mere combination of a number of old parts or elements is not patentable invention, if the combination of the old parts or elements, in their aggregation perform or produce no new or different function or operation. Hydraulic Press Manufacturing Co. v. Williams White & Co., 7 Cir., 165 F.2d 489.

A combination of old elements may define something that is new and useful, but it must also amount to a patentable invention.

Conclusions of Law

1. This Court has jurisdiction of this case, the parties thereto, and the subject matter thereof.

2. Claim 7 of Fageol patent 1,737,-966, in suit, defines no patentable invention, and hence is invalid.

3. Claims 1, 2 and 3 of Herman 1,957,645, in suit, define no patentable invention, and hence are invalid.

4. Herman's drawings and specification fail to disclose what Herman represented to the Patent Office was an essential element of Claims 1, 2 and 3, the concealing of the door guiding means behind the side panel, and hence these claims are invalid as not supported by the disclosure, a requirement of R.S. 4888, 35 U.S.C.A. § 33.

5. Claims 4, 9 and 13 of Nicol, 2,233,323, in suit, define no patentable invention and each of these claims is invalid.

Relief

1. Plaintiff Metropolitan Body Company may have declaratory judgment, declaring all claims in suit invalid.

2. Divco Corporation's counterclaim is dismissed.